**UNITED STATES of America**

v.

**Bob W. STERLING.**

**Crim. A. No. 32303.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Jan. 27, 1971.

**7.** Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

Gerald J. Gallinghouse, U. S. Atty., Joseph R. McMahon, Jr., Asst., U. S. Atty., for plaintiff.

Gene S. Palmisano, Lacour & Palmisano, New Orleans, La., for defendant.

HEEBE, District Judge:

On June 17, 1970, Bob W. Sterling was arrested by FBI Agents, accompanied by New Orleans police officers, for allegedly violating 18 U.S.C. § 659 by stealing two suitcases moving in interstate commerce. Thereafter, the Grand Jury returned a five-count indictment charging him with this and similar thefts to which Sterling pled not guilty. He then filed this motion to suppress on various grounds all physical evidence the government possessed as well as certain inculpatory statements made by defendant and allegedly obtained by the government in violation of defendant's *Miranda* rights. Pursuant to F.R.Crim.P. 12(b)(4), we ordered an evidentiary hearing. Because we feel that this evidence was obtained without violating any of defendant's rights, we deny the motion.

A. *Probable Cause*

Defendant moves for a blanket suppression of all the government's physical evidence on the ground that since the arresting agents lacked probable cause to arrest Sterling, all the evidence seized as a result of that arrest should be suppressed as being "fruit of the poisonous tree." Wong Sun v. United States, 371

U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Without deciding whether the poisonous tree is so long-limbed as to extend to all these "fruits," we deny this part of the motion for we find that the agents had probable cause for arrest.[1]

At the hearing, the evidence established that the FBI had been investigating a series of luggage thefts from New Orleans Moisant International Airport. On June 17, John Carter, an employee of Delta Airlines, informed the FBI that he had observed a 60-year-old white male, 5 ft. 7 in. tall, weighing about 140 lbs., wearing a green suit and white shoes, attempt to claim two suitcases. When challenged, he did not produce any claim checks but stated he was claiming the suitcases for a friend. When the rightful owner later claimed these bags, he reported missing two white suitcases belonging to his girl friend. Mr. Carter told the FBI that he had seen the above-described white male enter a cab carrying two white suitcases.

Mr. Ronald Raymond, a cab driver, testified that on June 17, 1970, he picked up the defendant at Moisant. He was carrying two white suitcases. Because of certain peculiar actions by his passenger, Mr. Raymond suspected criminal activity and contacted the New Orleans Police Department.[2] Later that day Mr. Raymond observed his passenger at the National Maritime Union Hall and contacted the police who, in turn, informed the FBI. Officers from both agencies met Raymond at the Hall where he repeated his story. Based on these facts and the description given by Mr. Carter, which is a substantially accurate description of the defendant, the FBI officers arrested him for the theft of the two white suitcases from the airport.

1. Because we deny the motion, we need not decide whether Sterling can seek suppression of evidence voluntarily turned over to the police by the victims, or evidence allegedly abandoned by the defendant.

2. Mr. Raymond testified that as Sterling approached his cab he recognized him as

having been a passenger in his cab three weeks earlier. Sterling, however, informed him that he had not been to New Orleans for seventeen years. Then, on the way downtown, defendant had Mr. Raymond stop at a motel where he walked into a room and came out with several additional pieces of luggage.

■ We think that the information supplied by Mr. Carter and corroborated and extended by Mr. Raymond gave the FBI officers information sufficient to warrant a reasonable man's belief that the defendant had stolen the two suitcases. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); Lathers v. United States, 396 F.2d 524 (5th Cir. 1968).

Defendant argues that, even assuming the FBI agents could arrest him for some crime, they did not have probable cause to arrest him for theft from interstate commerce. He relies on the admission of the FBI agents that they were accompanied by the New Orleans police officers because they were not certain that these suitcases had been on an interstate flight and, thus, whether a federal or state offense had been committed.

■■ This argument must fail for two reasons. First, probable cause does not require certainty; it merely requires a reasonable belief that the offense has been committed. "An officer need not be astronomically precise before making an arrest." Lathers v. United States, *supra*, at 531. The fact that, in an abundance of caution on the issue of which officers had jurisdiction, the FBI agents requested that the police officers accompany them does not eliminate the probable cause the agents already had. Moreover, to accept defendant's argument might result in the impermissible situation of having two sets of officers, each with probable cause to believe that an offense was committed, and yet because neither is certain of his jurisdiction, no arrest can be made.

B. *Illegal Search and Seizure*

Defendant moves to suppress certain check stubs and baggage keys on the grounds that they were seized in violation of his Fourth Amendment rights. Additionally, he seeks the suppression of all suitcases seized as the fruits of this illegal search. Wong Sun v. United States, *supra*.

■ This motion must fail because the evidence in dispute was seized during the routine processing of the defendant at FBI headquarters. United States v. Robert Lipscomb, 435 F.2d 795 (5th Cir. Dec. 8, 1970). All witnesses testified that the seizure complained of took place in FBI headquarters after defendant had been arrested. As part of his routine processing, the officers asked him to empty out his pockets and proceeded to inventory his personal belongings. Among his belongings were the check stubs and baggage keys complained of, with whose aid the FBI ultimately recovered some of the suitcases defendant is charged with stealing.

A similar inventory was recently upheld by the Fifth Circuit in *Lipscomb* over Fourth Amendment objections:

> " * * * the actions of the Montgomery police in inventorying, Lipscomb's personal belongings without a warrant did not constitute an unreasonable search. It can not be denied that to prevent escape, self-injury, or harm to others, the police have a legitimate interest in separating the accused from the property found in his possession. An inventory is then necessary both to preserve the property of the accused while he is in jail and to forestall the possibility that the accused may later claim that some item has not been returned to him." At 800.

*Accord,* United States v. Robbins, 424 F.2d 57 (6th Cir. 1970).

As in *Lipscomb,* we feel that this inventory was carried out not for some pretextual reason but as part of a legitimate processing procedure.

C. *Unnecessary Delay*

Defendant also moves for the suppression of the same check stubs, keys and suitcases, as well as the inculpatory statements discussed below, on the grounds that they were seized during an unnecessary delay in bringing defendant before a United States Commissioner. McNabb v. United States, 318

U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). F.R.Crim.P. Rule 5(a), which governs appearances before a United States Commissioner, provides in pertinent part that "any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner."

■ We first reject defendant's claim that the time delay in presenting him to the Commissioner was too long and unnecessary. Sterling was arrested at 5:00 p.m. on June 17 and brought before the United States Commissioner early the next afternoon. Since the United States Commissioner in New Orleans regularly sits only between 1:00 and 5:00 p.m., Sterling was presented to the Commissioner at the earliest time possible. *See, e.g.*, Thomas v. United States, 394 F.2d 247 (10th Cir. 1968), cert. den. 394 U.S. 931, 89 S.Ct. 1199, 22 L.Ed.2d 460; 1 Wright, Federal Practice and Procedure, § 74 (1969) and numerous cases cited in fn. 22 holding that "it is not an unnecessary delay to wait until regular business hours of the commissioner before producing the prisoner, and that statements obtained from the prisoner during that wait are admissible." Wright, *supra*. Moreover, we think it possible that even if the time delay were too long, the inculpatory statements made some two and one-half hours after the arrest and only thirty minutes after Sterling was brought to FBI headquarters for processing, would be admissible as "threshold statements" made at a point in time before there was any unnecessary delay. *See, e.g.*, United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944).

■ We also reject defendant's contention that under these circumstances, any delay of whatever length was illegal because the police used this delay to investigate other crimes. Defendant relies on Adams v. United States, 130 U.S. App.D.C. 203, 399 F.2d 574 (1968). Adams was arrested around 2:00 p.m. on November 5, 1965, for a liquor store robbery. Instead of presenting Adams to a magistrate, the police put him through a series of lineups all that afternoon and evening and again the following morning. The police admitted these lineups were designed to solve a number of "open" holdups. On the morning of November 6, Adams was finally identified by a store owner who had been robbed earlier that month. Only after this identification was Adams presented to a magistrate for the robbery for which he was arrested. The court excluded the lineup identification as a fruit of an illegal detention, finding that "a period of delay in presentment prompted solely by a purpose to try to connect the defendant with crimes other than the one for which he has been arrested" was an unnecessary delay within the meaning of F.R.Crim.P. 5(a). At 576.

That case is easily distinguished. First, unlike Adams, who could have been presented the afternoon he was arrested but was not, Sterling was presented to the Commissioner at the earliest time possible.

Moreover, we find that, unlike Adams, the delay in presenting Sterling was not for the purpose of investigating other crimes. Sterling argues that after the keys and stubs were discovered and after he admitted various thefts, he executed, at FBI request, a consent to search form. The FBI, accompanied by Sterling, then used this consent to recover some baggage allegedly stolen by Sterling earlier in June. Hence, this baggage should be suppressed, as in *Adams*, as the fruit of an illegal detention.

He also asks for the suppression of the rest of the government's evidence, arguing that the government will be prevented from harvesting such detentions only if the courts label all their fruits poisonous.

■ In applying Rule 5(a), the courts have not adopted a mechanical approach to "unnecessary delay" but have tended to look to the purpose of the delay. Mallory v. United States, 354 U.S.

449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); United States v. Chadwick, 415 F.2d 167 (10th Cir. 1969). If the delay is prompted by some illegitimate motive, as in *Adams*, then however short, it may be "unnecessary." Here we find no improper motive. A commissioner being unavailable after Sterling was arrested, the agents took him to headquarters for routine processing. During this processing Sterling freely and voluntarily admitted other thefts and freely and voluntarily offered to cooperate with the police in recovering the suitcases. He did not claim he was coerced into helping recover the suitcases, and the agents testified that no inducements were offered for this cooperation.

Defendant has cited no authority, and we have found none, which requires the police to cease their investigation of related crimes merely because they are unable to immediately present an arrestee to a Commissioner, and we decline to adopt such a rule.

### D. Miranda *Warnings*

Lastly, defendant moves to suppress all inculpatory statements he made to the FBI agents on the grounds that his *Miranda* rights were violated. He claims that he was never given his *Miranda* warnings, or, if he was, that the FBI extracted the statements after he refused to waive his rights.

The evidence clearly showed that Sterling was fully apprised of his constitutional rights. Upon arrest, agent Koy orally advised defendant of some of his rights. He was immediately taken to the FBI car where agent Reid showed defendant the standard waiver form. We think this form, which is reproduced in the margin,[3] to be substantially in compliance with the requirements of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant admitted that he read at least part of this form and that the whole form was read to him. Defendant refused to sign this waiver and was then taken to FBI headquarters where he was again read the waiver form and again refused to sign it. Thus, before any processing was conducted, defendant had been advised twice fully and once partially of his constitutional rights.

Since defendant had refused to waive his rights, the officers did not interrogate him but proceeded to process him. During the inventory described above, the agents found among his belongings two keys and asked him to identify them. Defendant answered that they belonged to the suitcases he had taken from the airport that morning and proceeded to make further inculpatory statements about other thefts he was suspected of committing. It is these statements that defendant seeks to suppress on the grounds that defendant never waived his *Miranda* rights.

In considering Sterling's motion, we are mindful of the heavy burden the government bears in demonstrating a waiver of constitutional rights, especially an oral waiver. Miranda v. Arizona, *supra,* at 475, 86 S.Ct. 1602. For a lucid

---

3. The Advice of Rights form is in two parts. The first part, entitled "Your Rights," informs the arrestee as follows:
   "Before we ask you any questions, you must understand your rights.

   "You have the right to remain silent.
   "Anything you say can be used against you in court.

   "You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

   "If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
   "If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."
   The second part, entitled "Waiver of Rights," is designed to enable the arrestee to execute a waiver of his rights by signing the form.

and comprehensive discussion of the waiver problem, see Comment, Waiver of Rights in Police Interrogations: *Miranda* in the Lower Courts, 36 U.Chi.L.Rev. 413 (1969). Nevertheless, we must deny suppression for we find that Sterling "voluntarily, knowingly and intelligently" waived his rights prior to any interrogation. Miranda v. Arizona, *supra*, at 475, 86 S.Ct. 1602. We repeat that before any questions were asked of defendant, he had been advised twice fully and once partially of his constitutional rights. Upon refusing to waive those rights, defendant was not interrogated. The question to which he responded was routinely asked during the inventorying procedure. Defendant did claim that he was coerced into answering but at trial introduced not a scintilla of credible evidence to support this charge. The statements were made not after a long period of interrogation during which the defendant was held incommunicado, but after thirty minutes of routine processing. Miranda v. Arizona, *supra*, at 476, 86 S.Ct. 1602. Moreover, we are dealing here not with a "suspect who has had little or no previous exposure to police interrogation and subsequent criminal prosecution, [where] it may even be doubtful that the suspect is in fact aware that he is relinquishing his legal rights by making an oral statement of waiver." Comment, Waiver of Miranda Rights, *supra*, at 428. Rather, Sterling himself testified that he has been arrested on numerous occasions and convicted on several. Presumably, he has been warned of his *Miranda* rights on prior occasions and is certainly no stranger to police interrogation. Under all these circumstances, we must conclude that when defendant decided to answer the routine question as he did, he freely and voluntarily waived his constitutional right to remain silent and to have an attorney present—rights of which he had been fully and repeatedly advised.

Accordingly, it is the order of the Court that defendant's motion to suppress be, and the same is hereby, denied with respect to all particulars.